UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ANDREW CASE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:21-cv-00051-SLC |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, *sued as Kilolo Kijakazi*, ) | |
| *Acting Commissioner of Social Security*,[1] ) | |
| ) | |
| Defendant. ) | |

OPINION AND ORDER

Plaintiff Andrew Case appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").  (ECF 1).  Case filed his opening brief on August 31, 2021, and the

Commissioner timely filed her response in opposition on November 9, 2021.  (ECF 18-ECF 21).

Case, however, failed to file a reply brief to the Commissioner's arguments, and his time to do so

has now passed.  (ECF 23).  For the following reasons, the Commissioner's decision will be

AFFIRMED.

I.  FACTUAL AND PROCEDURAL HISTORY

Case applied for DIB and SSI in July 2018, alleging disability as of May 1, 2015.[2]  (ECF 15

Administrative Record ("AR") 15, 229-30).  Case's claim was denied initially and upon

---

[1]  Kilolo Kijakazi is now the Acting Commissioner of Social Security, *see, e.g.*, *Butler v. Kijakazi*, 4 F.4th 498 (7th Cir. 2021), and thus, she is automatically substituted for Andrew Saul in this case, *see* Fed. R. Civ. P. 25(d).

[2]  Regardless of a claimant's claimed onset date, SSI is not payable until the month following the month in which a claimant files his SSI application.  *See* 20 C.F.R. § 416.335.  Therefore, the first month Case could be eligible to receive SSI is August 2018, given that he applied for SSI in July 2018.

reconsideration.  (AR 94, 105).  On May 27, 2022, administrative law judge ("ALJ") Stephanie

Katich conducted an administrative hearing at which Case, who was represented by counsel, and

a vocational expert ("VE") testified.  (AR 32-83).  On August 26, 2020, the ALJ rendered an

unfavorable decision to Case, concluding that he was not disabled because despite the limitations

caused by his impairments he could perform a significant number of light-exertional jobs in the

national economy.  (AR 15-25).  The Appeals Council denied Case's request for review (AR 1-

6), at which point the ALJ's decision became the final decision of the Commissioner.  *See* 20

C.F.R. §§ 404.981, 416.1481.

    Case filed a complaint with this Court on February 4, 2021, seeking relief from the

Commissioner's decision.  (ECF 1).  In his opening brief, Case primarily argues that the ALJ's

step-five finding is not supported by substantial evidence because the VE's testimony about his

methodology was insufficient to establish the reliability of the national job numbers.  (AR 17-

22).  In a much briefer second argument, Case asserts that  the ALJ failed to account in the

residual functional capacity ("RFC") for his expected absenteeism and need for excessive

restroom breaks.  (AR 22-23).

    At the time of the ALJ's decision, Case was thirty-eight years old (AR 37, 229); had

obtained his general educational diploma (GED) (AR 37, 254); and had past work experience as

a construction supervisor, concrete laborer, welder assembler, and assembler manufacturer of

housing (AR 24, 66-69, 254).  In his application, Case alleged disability due to degenerative disc

disease; problems with his shoulders, back, and knees; asthma; and hypoglycemia.  (AR 253).

## II.  STANDARD OF REVIEW

    Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner . . . , with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed "only if [it is] not supported by substantial

evidence or if the ALJ applied an erroneous legal standard."  *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative

record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or

substitute [its] own judgment for that of the Commissioner."  *Id.* (citations omitted).  "Rather, if

the findings of the Commissioner . . . are supported by substantial evidence, they are

conclusive."  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted).  "In other

words, so long as, in light of all the evidence, reasonable minds could differ concerning whether

[the claimant] is disabled, we must affirm the ALJ's decision denying benefits."  *Books v.*

*Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III.  ANALYSIS

#### A.  The Law

Under the Act, a claimant seeking DIB or SSI must establish that he is "unable to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less

than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also* 42 U.S.C. §§ 416(i)(1),

423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence:  (1) whether the claimant is

currently unemployed in substantial gainful activity, (2) whether he has a severe impairment, (3)

whether his impairment is one that the Commissioner considers conclusively disabling, (4)

whether he is incapable of performing his past relevant work, and (5) whether he is incapable of

performing any work in the national economy.[3]  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th

Cir. 2001); *see also* 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to the

next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v.*

*Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three

stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof

lies with the claimant at every step except the fifth, where it shifts to the Commissioner.

*Clifford*, 227 F.3d at 868.

### B.  The Commissioner's Final Decision

On August 26, 2020, the ALJ issued a decision that ultimately became the Commissioner's

final decision.  (AR 15-25).  The ALJ first observed that Case met the insured status

requirements for DIB through March 31, 2020, and that while he had worked after his alleged

onset date of May 1, 2015, such work did not rise to substantial gainful activity.  (AR 18).  At

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks he can do despite his limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 416.920(e).

step two, the ALJ found that Case had the following severe impairments:  status post lumbar

fusion with residual degenerative disc disease of the lumbar and thoracic spine, hip

disorder/sacroiliac joint dysfunction, trace scoliosis, left shoulder impingement/bone spur, status

post open left clavicle distal excision, left shoulder serratus tear and repair, status post left knee

tendon repair, headaches/cluster headaches, asthma, and chronic fatigue syndrome.  (*Id.*).  At

step three, the ALJ concluded that Case did not have an impairment or combination of

impairments severe enough to meet or equal a listing.  (AR 19).

Before proceeding to step four, the ALJ determined that Case's symptom testimony was

"not entirely consistent with the medical evidence and other evidence in the record . . . ."  (AR

20-21).  The ALJ assigned Case the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except that the claimant can occasionally climb
> ramps and stairs, he can never climb ladders, ropes, or scaffolds, he can
> occasionally balance, stoop and crouch, he can never kneel or crawl, he can never
> reach overhead with the bilateral upper extremities, and he should avoid
> concentrated exposure to extreme heat, extreme cold, wetness, humidity,
> vibration, fumes, odors, dusts, gases, poorly ventilated areas, and hazards such as
> unprotected heights and unguarded moving machinery.

(AR 19-20).

The ALJ determined at step four that given the foregoing RFC, Case could not perform any

of his past relevant work.  (AR 24).  However, at step five the ALJ found that Case could

perform a significant number of light-exertional jobs in the national economy, including retail

marker, sales attendant, and bakery conveyor worker.  (AR 25).  Therefore, Case's applications

for DIB and SSI were denied.  (*Id.*).

## C.  The ALJ's Step-Five Finding

Case's main argument in this appeal is that the ALJ's step-five determination lacks the

support of substantial evidence because the VE's methodology in arriving at the number of jobs was unreliable.  (ECF 24 at 16-22).  For the following reasons, Case's argument is unpersuasive.

1.  Applicable Law

At step five, the Commissioner bears the burden "for providing evidence that demonstrates that . . . work exists in significant numbers in the national economy that [the claimant] can do, given [his] residual functional capacity and vocational factors."  20 C.F.R. §§ 404.1560(c)(2); 416.960(c)(2).  "Because estimating job numbers is no easy feat, ALJs commonly rely on the testimony of vocational experts—professionals with experience in job placement and knowledge of working conditions."  *Ruenger v. Kijakazi*, 23 F.4th 760, 763 (7th Cir. 2022) (citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019); 20 C.F.R. § 416.966(e)).

"In the context of job-number estimates, substantial evidence requires the ALJ to ensure that the vocational expert's estimate is the product of a reliable methodology."  *Id.*; *see also Brace v. Saul*, 970 F.3d 818, 821-22 (7th Cir. 2020); *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018); *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009); *Ehrhart v Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992).  "A methodology is reliable when it is based on 'well-accepted' sources and the vocational expert explains her methodology 'cogently and thoroughly.'"  *Ruenger*, 23 F.4th at 763 (quoting *Biestek*, 139 S. Ct. at 1155).  "And when . . . the claimant challenges the job-number estimate, the ALJ must compel the vocational expert to offer a 'reasoned and principled explanation' of the methodology [he] used to produce the estimate."  *Id.* (quoting *Chavez*, 895 F.3d at 970).  "The expert's explanation must be sufficient to instill some confidence that the estimate was not 'conjured out of whole cloth.'"  *Id.* (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)).

6

Having said that, "[e]stablishing the reliability of a job-number estimate does not require meeting an overly exacting standard." *Chavez*, 895 F.3d at 968. "A VE's estimate will be just that—an estimate." *Id.* "[T]he threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla." *Biestek*, 139 S. Ct. at 1154 (citations and internal quotation marks omitted).

When estimating the number of jobs available in response to hypotheticals posed by the ALJ, a VE will often use one of two methods:

> (i) the equal distribution method, which involves finding the total number of jobs in an occupational group and dividing that number by the number of occupations in the group; and (ii) the occupational density method, which considers the intersection of the broad category of available jobs and the particular industry in which the claimant would work.

*Dawn L. C. v. Comm'r of Soc. Sec.*, No. 3:20-cv-00626-GCS, 2021 WL 4488421, at *6 (S.D. Ill. Sept. 24, 2021) (internal citations omitted); *see also Albright v. Kijakazi*, No. 1:20-CV-438-JPK, 2022 WL 669897, at *5 (N.D. Ind. Mar. 4, 2022). The Seventh Circuit Court of Appeals has "repeatedly questioned the accuracy of the equal distribution method."[4] *Ruenger*, 23 F.4th at 762 (citing *Alaura*, 797 F.3d at 508; *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)); *see also Albright*, 2022 WL 669897, at *5.

---

[4] Specifically, in *Alaura v. Colvin*, the Seventh Circuit stated:

> The problem appears to be that the only reliable statistics are census date for broad categories of jobs, rather than for jobs in the narrower categories that the applicant for benefits is capable of doing. Typically, it appears the vocational expert simply divides the number of jobs in the broad category that includes the narrow category of jobs that the applicant can perform by the number of narrow *categories* in the broad category, thus assuming that each narrow category has the same number of jobs as each other narrow category—which is preposterous. A vocational expert's stated number of jobs in a narrow category seems likely, therefore, to be a fabrication.

797 F.3d 503, 507-08 (7th Cir. 2015) (internal citations omitted).

Yet, the Seventh Circuit has also "consistently declined to reject any particular method of estimation as inherently unreliable, preferring instead to place the burden on the ALJ to inquire as to other factors supporting the VE's findings." *Dawn L.C.*, 2021 WL 4488421, at *6 (citing *Chavez*, 895 F.3d at 970); *see Ruenger,* 23 F.4th at 764 ("We have never enjoined the use of the equal distribution method, but we have required that a vocational expert justify her use of it."); *Coyier v. Saul*, 860 F App.x 426, 428 (7th Cir. 2021) (stating that *Chavez* "did not enjoin the use of the equal-distribution method"). "District courts within the Seventh Circuit have split as to whether the equal distribution method or the occupational density method should be preferred." *Dawn L.C.*, 2021 WL 4488421, at *6 (collecting cases). "The Seventh Circuit expresses no preference for either method, so long as the VE provides some reason for choosing one method over another."[5] *Id.* (citing *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020)).

"[W]hen a claimant challenges a vocational expert's job-number estimates, the ALJ has a duty to spend time inquiring into the expert's methodology." *Ruenger*, 23 F.4th at 764 (citing *Chavez*, 895 F.3d at 970). As the Seventh Circuit recently opined: "Although the ALJ asked [the VE] to describe her methodology, substantial evidence requires more. The ALJ must 'hold the [vocational expert] to account for the reliability of [her] job-number estimates." *Id.* (second and third alterations in original); *see, e.g., Albright*, 2022 WL 669897, at *7.

---

[5] For example, as one judge in this District noted: "Job Browser Pro might be a useful tool, but the VE needs to be able to explain how Job Browser Pro makes its job number estimates, how she used the software to generate her own estimates, and why she believes those estimates are reliable." *Maples v. Saul*, No. 1:20-cv-157-PPS, 2021 WL 1291766, at *6 (N.D. Ind. Apr. 7, 2021) (quoting *Westendorf v. Saul*, No. 2020 WL 19-cv-1019-jdp, 2020 WL 4381991, at *4 (W.D. Wis. July 31, 2020)). "In other words, saying that 'I don't know how to explain it, but it's all on the software' . . . doesn't cut it." *Id.*; *see also Hood v. Saul*, No. 1:19-CV-370-TLS, 2021 WL 5002717, at *4 (N.D. Ind. Oct. 28, 2021) ("Stating that SkillTRAN 'looks at the percentages' does not 'cogently and thoroughly' explain the methodology of how the job number estates were obtained.").

2. <u>Analysis</u>

At the administrative hearing, the VE testified that a hypothetical individual with Case's age, education, work experience, and RFC could perform the representative light-exertional occupations of  retail marker, 271,000 jobs nationally; sales attendant, 210,000 jobs nationally; and bakery conveyor worker, 18,000 jobs nationally.  (AR 71; *see also* AR 25).  The ALJ in reliance on the VE's testimony concluded that Case was not disabled because he could still perform a significant number of jobs in the national economy despite the credible limitations caused by his impairments.  (AR 25).

Case argues that the ALJ's step-five finding is not supported by substantial evidence because the VE's testimony about the number of jobs is not a product of reliable methodology. Specifically, Case emphasizes the VE "did not know the allocation factor or any mathematical formula used by the software employed [(SkillTRAN)] to obtain an allocation factor."  (ECF 18 at 17).  As such, Case contends "it is unclear whether the VE is applying his expertise to test the software's mechanism and its end product or whether the VE is merely treating the software as a calculator—i.e. pushing the buttons of a black box for an answer."  (*Id.* at 20).  Case asserts the ALJ "failed to 'hold the VE to account for the reliability of [his] job-number estimates.'"  (*Id.* at 21 (quoting *Chavez*, 895 F.3d at 970)).

When Case's attorney first questioned the VE about the methodology he used in arriving at the job numbers, the VE responded that he "use[d] the SkillTRA[N] numbers."[6]  (AR 74).  The VE then confirmed to Case's attorney that SkillTRAN "basically start[s] with a standard

---

[6] SkillTRAN is a software producer, which produces a variety of programs for vocational professionals, such as Job Browser Pro and Occubrowse. *See Dunn v. Kijakazi*, No. 20-C-1113, 2021 WL 5105169, at *12 (E.D. Wis. Sept. 24, 2021); *see also About,* SKILLTRAN, https://skilltran.com/index.php/home/about (last visited May 2, 2022).

occupational code and then allocate[s] to a DOT title."[7]  (AR 74).

"In contrast to the . . . [often criticized] equal distribution method, SkillTRAN's occupational density method relies on the Department of Labor's Occupational Employment Survey ('OES') to estimate the number of available jobs."  *Dawn L.C.*, 2021 WL 4488421, at *6 (citing *Bruno*, 817 F. App'x at 243).  Courts have pointed out, though, that "the mere fact that SkillTRAN was used is not itself substantial evidence of reliability."  *Eidenier v. Kijakazi*, No. 1:20-CV-277-JPK, 2022 WL 179060, at *8 (N.D. Ind. Jan. 19, 2022).  "[T]he issue . . . is not whether SkillTRAN is reliable as a matter of law, but rather whether the VE's testimony in this case, drawing in part on the SkillTRAN data, was sufficient to sustain the agency's step five burden."  *Dunn*, 2021 WL 5105169, at *12; *see Foth v. Saul*, No. 20-CV-113, 2021 WL 535433, at *8 (E.D. Wis. Feb. 12, 2021) ("The Seventh Circuit has not spoken directly on the reliability of the SkillTRAN software, and courts in this circuit have upheld the VE's use of SkillTRAN and the ALJ's reliance on the numbers produced by SkillTRAN when the VE explains the methodology behind SkillTRAN." (collecting cases)).

Here, the VE admitted that he did not know the "allocation factors" or "mathematical formula that SkillTRA[N] uses to arrive at the DOT numbers[.]"  (AR 74-75).  However, this admission is not fatal to the VE's testimony, as a VE's explanation need "not reveal the precise mechanics and statistical method involved."  *Bruno*, 817 F. App'x at 243; *see also Rosner v.*

---

[7] The Dictionary of Occupational Titles (DOT) is a "Social Security Administration resource[] that list[s] occupations existing in the economy and explain[s] some of the physical and mental requirements of those occupations."  *Ferguson v. Berryhill*, 381 F. Supp. 3d 702, 705 n.2 (W.D. Va. 2019) (quoting *Pearson v. Colvin*, 810 F.3d 204, 205 n.1 (4th Cir. 2015)); *see also Tolbert v. Astrue*, No. 2:07-CV-426-PRC, 2008 WL 4449557, at *2 n.1 (N.D. Ind. Sept. 26, 2008).  "The Social Security Administration also uses a companion resource to the DOT, entitled SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES (1993) . . . , that explains additional physical and environmental demands of the occupations listed in the DOT."  *Ferguson*, 381 F. Supp. 3d at n.2 (quoting *Thomas v. Berryhill*, 916 F.3d 307, 310 n.1 (4th Cir. 2019)).

*Kijakazi*, No. 20-C-1346, 2022 WL 110309, at \*3 (E.D. Wis. Jan. 12, 2022).  Rather, the VE

must provide a "'reasoned and principled explanation [of his methodology]', at least by the low

substantial evidence standard," *Bruno*, 817 F. App'x at 243 (quoting *Chavez*, 895 F.3d at 970),

sufficient to "instill the court with some confidence in its reliability," *Rosner*, 2022 WL 110309,

at \*3.  *See also Brace*, 970 F.3d at 822 (explaining that a VE's "job-number testimony will

survive review under the substantial-evidence standard as long as it rests on a well-accepted

methodology and the expert describes the methodology 'cogently and thoroughly'" (quoting

*Biestek*, 139 S. Ct. at 1155)).

Significantly, once Case's attorney objected to the VE's testimony, the ALJ questioned the

VE about his understanding of SkillTRAN's methodology.  (AR 75-76); *see Ruenger*, 23 F.4th at

764 ("We are mindful ot the time constraints and heavy caseloads faced by ALJs.  But when a

claimant challenges a vocational expert's job-number estimates, the ALJ has a duty to spend

time inquiring into the expert's methodology." (citing *Chavez*, 895 F.3d at 970))).  The VE

responded:

> SkillTRA[N], first of all, some of the numbers, it depends on the particular job
> category that there are some of the numbers that are directly related to DOT
> numbers.  Then others are grouped together within a certain category or a certain
> occupational group.  And then, they're also considered as far as by industry, where
> it's more likely, or most likely that you would find those particular jobs given a
> certain DOT number.  So what they'll do is they'll look at the combination of
> here's how many jobs, these are the job titles, and then where would those jobs
> exist in terms of specific industry groups.  And so, that's how they arrive at an
> estimate of how many exist for a particular DOT number.

(AR 76).  Thus, upon probing by the ALJ, "the VE explain[ed] the methodology behind

SkillTRAN." *Foth*, 2021 WL 535433, at \*8.  "[While] the VE's description [of the SkillTRAN

program] did not reveal the precise mechanics and statistical model involved, it nevertheless

11

constitutes a 'reasoned and principled explanation,' at least by the low substantial evidence standard." *Bruno*, 817 F. App'x at 243; *see, e.g.*, *Frankie M. v. Kijakazi*, No. 1:20-CV-228-JFB, 2022 WL 168094, at *2 (N.D. Ind. Jan. 19, 2022) (finding that the VE's testimony regarding job numbers was sufficiently reliable, where "[t]he VE used the SkillTRAN program, which is accepted in the field, and the VE was able to descriptively, though not mathematically, explain how the program derived its estimates of job numbers").

The VE further stated that he had used SkillTRAN "for many years" and found that the software produced "consistent" results.  (AR 77).  Also, given that the ALJ asked the VE whether the sample jobs identified were consistent with the DOT (AR 81; *see also* AR 66, 79-80), "which is typically used as a basis for the equal distribution method of estimating available jobs, . . . [t]his indicates that [the VE] did not rely on SkillTRAN alone." *Dawn L.C.*, 2021 WL 4488421, at *7.  The ALJ testified that he also relied on:  (1) his more than forty years of professional experience as a vocational expert; and (2) his own research, including personally observing sample occupations being performed in the workplace.  (AR 80).  This evidence constitutes "more than a mere scintilla," *Biestek*, 139 S. Ct. at 1154, and provides an adequate foundation for the VE's estimates.  *See Dawn L.C.*, 2021 WL 4488421, at *7 (finding the VE's reliance on SkillTRAN, the DOT, and her education and experience "provided an adequate foundation for her estimates").

Having considered the record presented, the ALJ's step-five determination about the number of representative jobs is supported by substantial evidence—namely, the testimony of the VE that was a product of reliable methodology.  Consequently, the Commissioner's step-five challenge does not merit a remand.

*D.  The RFC*

In a much briefer argument, Case argues that the ALJ erred when assigning the RFC by

failing to account for his expected absenteeism and "excessive need for breaks because of [his]

intestinal impairments."  (ECF 18 at 22-23).  The Commissioner contends in response that Case

has waived this argument by advancing only a conclusory argument and failing to cite any

"medical opinion, objective medical findings, or any other specific evidence of record that would

support his contention."  (ECF 21 at 13). The Commissioner further argues that even if Plaintiff

did not waive the argument, substantial evidence supports the ALJ's decision not to include off-

task or absence limitations in the RFC.  (*Id.*).

1.  Applicable Law

The RFC is "the individual's *maximum* remaining ability to do sustained work activities in

an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five

days a week.  SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (second emphasis omitted).

That is, the "RFC is not the *least* an individual can do despite his or her limitations or

restrictions, but the *most*."  *Id.* at *1; *see also Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th

Cir. 2004); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

> The [RFC] assessment is based upon consideration of all relevant evidence in the
> case record, including medical evidence and relevant nonmedical evidence, such
> as observations of lay witnesses of an individual's apparent symptomology, an
> individual's own statement of what he or she is able or unable to do, and many
> other factors that could help the adjudicator determine the most reasonable
> findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545(a)(3),

416.945(a)(3).

When determining the RFC, the ALJ must consider all medically determinable impairments,

mental and physical, even those that are non-severe.  20 C.F.R. §§ 404.1545(a)(2),

416.945(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).  "[An] ALJ is not

required to rely entirely on a particular physician's opinion or choose between the opinions of

any of the claimant's physicians."  *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).  Rather,

"the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or

examining doctor—to decide."  *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citing 20

C.F.R. § 404.1527(d)).

    2. Analysis

 In challenging the RFC, Case cites to his own testimony that he spends twenty minutes in

the restroom five to six times a day and would be absent one to two days a week due to his

intestinal issues, and to the VE's testimony that such a schedule would be preclusive of

competitive employment.  (ECF 18 at 23 (citing AR 60, 74)).  But as the Commissioner

emphasizes, Case does not support his argument with any citations to medical findings or

medical source opinions.  As such, Case's argument is conclusory.  "It is not for this Court to

develop the Plaintiff's arguments or comb through the record to find support."  *Herman C. v.*

*Saul*, No. 1:19-cv-04278-SEB-DLP, 2020 WL 5752436, at *7 (S.D. Ind. Sept. 2, 2020), *R. & R.*

*adopted by Collins v. Saul*, 2020 WL 5653476 (Sept. 22, 2020); *see also Crespo v. Colvin*, 824

F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that

are unsupported by pertinent authority, are waived." (citation omitted)); *Gross v. Town of*

*Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles

buried in [the record]." (alteration in original) (citation omitted)).

    Moreover, as stated earlier, Case opted not to file a reply brief to the Commissioner's

response brief.  Consequently, the  Commissioner's argument—that Case's challenge to the RFC

is undeveloped and thus waived—remains unopposed.  *James M. v. Saul*, No. 2:20-cv-00183-

MJD-JPH, 2021 WL 2820532, at *1 (S.D. Ind. July 7, 2021) (stating that brief and undeveloped

arguments are deemed waived) (collecting cases).

In any event, the ALJ expressly considered Case's diverticulitis and related intestinal

conditions at step two but concluded they were non-severe, causing "no more than a minimal

limitation in [Case's] ability to complete work activity."  (AR 18).  The ALJ further explained

that she had considered "*all* of [Case's] medically determinable impairments"—thus, including

those that are non-severe—when assessing Case's RFC.  (*Id.* (emphasis added)).

Moreover, in assigning the RFC the ALJ relied in part on the state agency doctors' opinions

who found Case could perform a range of light work but included no limitations for excessive

absenteeism or workday breaks.  (AR 23 (citing AR 89-91, 113-15)).  Likewise, the consultative

examiner, Stephen Parker, M.D., did not include any limitations for excessive absenteeism or

extra workday breaks.  (AR 535-44).  Nor did Case's treating orthopedist—who released Case to

return to work in October 2019 following his latest surgery—include such limitations.  (AR 836-

38, 855).

"[T]he primary responsibility for producing medical evidence demonstrating the severity of

impairments remains with the claimant."  *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448

(7th Cir. 2004) (citing 20 C.F.R. § 416.912(c)).  That is, "[i]t is axiomatic that the claimant bears

the burden of supplying adequate records and evidence to prove [his] claim of disability."

*Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v.*

*Yuckert*, 482 U.S. 137, 146 n.5 (1987)).  Case has failed to carry his burden of citing medical

evidence and medical source opinions to support his claim that he will miss one or two days a

week and require twenty-minute restroom breaks five to six times a day due to his intestinal

problems or otherwise.  "The ALJ needed only to include limitations in [the] RFC determination

that were supported by the medical evidence and that the ALJ found to be credible." *Outlaw v.*

*Astrue*, 412 F. App'x 894, 898 (7th Cir. 2011).[8]  Given the record presented, the RFC assigned

by the ALJ is supported by substantial evidence.

### IV.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED.  The Clerk is

DIRECTED to enter a judgment in favor of the Commissioner and against Case.

SO ORDERED.

Entered this 8th day of June 2022.

<div style="margin-left:50%">

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

</div>

---

[8] As stated earlier, the ALJ found Case's symptom testimony "not entirely consistent with the medical evidence and other evidence in the record . . . ."  (AR 21).  Case does not directly challenge the ALJ's determination about his symptom testimony.  (*See* ECF 18).